IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

DERRICK ADAMSON,

      Plaintiff,

v.                                  Case No. 2:19-cv-00575

WEXFORD HEALTH SOURCES, INC.,
SANDRA MAY, *PA,* PAM GIVENS, *HSA,*
and DR. CHARLES LYE, *M.D.*,

      Defendants.

## PROPOSED FINDINGS AND RECOMMENDATION

      This matter is assigned to the Honorable John T. Copenhaver, Jr., Senior United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).  Pending before the court is Defendants' Motion for Summary Judgment (ECF No. 75).

### *I.    BACKGROUND AND RELEVANT PROCEDURAL HISTORY*

      Derrick Adamson ("Plaintiff") is an inmate in his mid-40s, serving a life without mercy sentence, who is presently incarcerated at the Mount Olive Correctional Complex ("MOCC").  Plaintiff was diagnosed with chronic Hepatitis C ("HCV") more than a decade ago.  This matter is proceeding on Plaintiff's Amended Complaint (ECF No. 23) against Wexford Health Sources, Inc. ("Wexford"), and several of its employees (collectively "the Wexford Defendants" or "Defendants").  The Amended Complaint alleges that Plaintiff has repeatedly sought and been denied treatment with Direct-Acting Antiviral ("DAA")

drugs for his chronic HCV by the Wexford Defendants because he is "not sick enough" to necessitate such treatment. (ECF No. 23 at 1-2).

Plaintiff's amended complaint alleges that he "experiences abdominal pain in his liver area . . . has little appetite, no energy, lack of sleep and is constantly in fear about the state of his health and when his condition will lead to his death." (*Id.* at 2). Plaintiff further alleges that, in lieu of receiving DAA drugs, which is the new prevailing standard of care, his "constant abdominal pain" has been treated with ibuprofen and other pain relievers which "does more harm than good" and essentially amounts to no treatment at all. (*Id.* at 2-5). Plaintiff further contends that Defendants, in accordance with Wexford policy, custom, or practice, consistently delay or deny treatment to persons suffering from HCV until they develop liver fibrosis, cirrhosis, liver failure, or liver cancer, also decreasing the benefits of the treatment, and that such actions constitute deliberate indifference to a serious medical need in violation of the Eighth Amendment to the United States Constitution. (*Id.* at 5-6).

Plaintiff's claims for damages were previously dismissed after the presiding District Judge found that Defendants were entitled to qualified immunity. (ECF No. 53 at 3). However, Plaintiff's claims for declaratory and injunctive relief in the form of treatment with DAA drugs remain before the court. Specifically, Plaintiff seeks a declaratory judgment finding that "Defendants' policy of withholding DAA drug treatment from Plaintiff and others with HCV violates the Eighth Amendment." (ECF No. 23 at 6). Plaintiff also seeks a permanent injunction directing Defendants to "formulate and implement HCV treatment policy that meets prevailing standards of care; to treat Plaintiff with appropriate DAA drugs; provide an appropriate and accurate assessment of the level of fibrosis he may have; counseling on drug-drug interactions; and ongoing

medical care for complications from the delay of treatment and any other symptoms associated with HCV." (*Id*.)

Pending before the court is Defendants' Motion for Summary Judgment (ECF No. 75), with accompanying exhibits,[1] and a Memorandum of Law in support thereof (ECF No. 76). Defendants assert that "the undisputed facts on the record of this matter do not show the Plaintiff to be entitled to the permanent injunction he seeks." (ECF No. 76 at 7). They contend that Plaintiff cannot show any irreparable injury or that the injunctive relief requested is equitable and in the public interest. (*Id*. at 7-10). Defendants further contend that Plaintiff has not demonstrated that they acted with deliberate indifference to a serious medical need and that his claim for declaratory relief also fails as a matter of law. (*Id*. at 10-15).

Pursuant to the holding of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), Plaintiff was notified by the undersigned of his right and obligation to respond to Defendants' motion and of the type of evidence required to overcome summary judgment. (ECF No. 77). On March 11, 2022, Plaintiff filed a response to Defendants' motion. (ECF No. 78). As will be discussed *infra*, Plaintiff attempts to dispute the affidavits presented by Defendants and provides his own affidavit addressing communications he had with Defendant May about his eligibility for DAA drug treatment. (*Id*. at 6 (Ex. 1)).[2] Plaintiff's

---

[1] In addition to excerpts from Plaintiff's medical records (ECF No. 75, Ex. 1), Defendants have offered two affidavits in support of their motion for summary judgment. The first is the Affidavit of Dr. Dina Paul, M.D., who is Wexford's Chronic Disease and Case Management Director and a licensed physician in West Virginia, who is a proposed expert witness for Defendants. (ECF No. 75, Ex. 2). The second is the Affidavit of Defendant Sandra May, P.A., a West Virginia licensed physician's assistant employed by Wexford, who was personally involved in Plaintiff's medical treatment at MOCC. Defendants' final exhibit is a printout of the Centers for Disease Control's ("CDC") *Hepatitis C Surveillance Guidance*. (ECF No. 75, Ex. 4).

[2] Plaintiff previously submitted a notarized version of this affidavit on May 6, 2021, when the Court was considering the parties' motions to dismiss. (ECF No. 48). As the case was at the motion to dismiss stage at that time, the Court did not rely on the affidavit. Although the current version of the affidavit is not notarized, the undersigned will consider the notarized version in ECF No. 48 as being part of the record for summary judgment purposes.

response also provides a copy of a Wexford "Medical Services Referral and Report" form dated January 17, 2018, in which Dr. Dina Paul sought a referral for a "LIVER AND SPLEEN ULTRASOUND; ASSESS LIVER ECHOTEXTURE, SCREEN FOR LIVER MASS, ASSESS SPLEEN SIZE." (ECF No. 78 at 7 (Ex. 2)). Plaintiff asserts that, when his liver test results were high enough to warrant treatment, an order was made for him to have an ultrasound of his liver and spleen, but the ultrasound never occurred and treatment with curative drugs was still denied. He contends that Defendants' Lye and May "neglected to send him for that ordered diagnostic evaluation" and that their "wait and see" approach "shocks the conscience" and "is a blatant violation of the Eighth Amendment." (*Id*. at 2-3).

On April 4, 2022, Defendants filed a reply brief which largely repeats their earlier contentions. (ECF No. 79). The reply again emphasizes that Plaintiff has provided no evidence to establish his right to either the declaratory or injunctive relief he seeks. (*Id*. at 2-3). Relying on Dr. Paul's unrebutted affidavit, the reply further explains why Plaintiff was not sent to CAMC for an ultrasound and further evaluation and reiterates that Plaintiff has shown no evidence of liver damage, let alone serious or permanent harm. (*Id*. at 4).

Thereafter, Plaintiff filed an unauthorized sur-reply (ECF No. 80), which Defendants moved to strike (ECF No. 81). However, the undersigned has denied the motion to strike and will consider the sur-reply, which disputes Defendants' assertion that he has not established an irreparable injury sufficient to support his requests for permanent injunctive relief. (*Id*. at 1-2). Plaintiff further reiterates his assertion that Defendant May's statements acknowledging that he met the criteria for DAA drug treatment, but was allegedly not provided that treatment because of his mental health

issues, is demonstrative of deliberate indifference to a serious medical need. (*Id.* at 2).

Plaintiff's sur-reply also introduces, for the first time, an allegation that he has a "spider web of blood vessels that have covered the top of his body" which he believes is indicative of the progress of his HCV and would support a finding of a permanent or irreparable injury sufficient to warrant his requested injunctive relief. (*Id.* at 3). However, Plaintiff provides no evidence, expert or otherwise, to support this allegation. Finally, Plaintiff's sur-reply presents a new argument that Defendants Lye and May allegedly admitted in requests for admissions that they are not "qualified to treat HCV" or to "develop a treatment plan," and that their "refusal and neglect to send him to CAMC to a doctor qualified to treat HCV is blatant evidence of Defendants' deliberate indifference to Plaintiff's HCV treatment." (*Id.* at 4). However, he has not provided evidence of those admissions with his filings. This matter is fully briefed and ripe for adjudication.

## II.    *STATEMENT OF RELEVANT FACTS AND EVIDENCE*

At all times relevant to this lawsuit, Plaintiff was an inmate at MOCC. Wexford contracts with the State of West Virginia to provide medical care to inmates at MOCC. Dr. Charles Lye ("Lye") was the medical director at MOCC.[3] Sandra May ("May") is a Physician's Assistant at MOCC. Pam Givens ("Givens") is the Health Services Administrator at MOCC.

Plaintiff was diagnosed with chronic HCV prior to his present incarceration, and according to his amended complaint, his HCV positive status was reconfirmed by blood work at the Tygart Valley Regional Jail when he was arrested in 2015. (ECF No. 23 at 1-2). Wexford was notified of same when he was transferred to MOCC on February 6, 2017.

---

[3] Upon information and belief, Dr. Lye has since retired from employment with Wexford.

(ECF No. 75, Ex. 1 at 18, WEX000200).  At that time, he was evaluated and enrolled in the Chronic Care Clinic (hereinafter "CCC").  (*Id.*)  As part of the CCC, Plaintiff is to be clinically evaluated at least every six months by an on-site provider, such as Lye or May, to determine the progression of his HCV, if any.  (Aff. of Dina Paul. M.D., ECF No. 75, Ex. 2, ¶ 3).

As part of the CCC, liver function blood work is drawn and the test results reviewed, and Plaintiff is to be physically examined.  (*Id.*, ¶ 4).  Liver function laboratory results encompass multiple tests including liver function tests (LFTs), Protime/Internationalized Ratio (PT/INR) blood clotting values, Albumin level, Bilirubin level, and the Platelet count.  (*Id.*, ¶ 5).  The AST to Platelet Ratio Index (hereinafter "APRI") is a simple ratio of two lab values (the AST and the Platelet count) that has been found to correlate with the degree of liver fibrosis.  (*Id.*)  Higher APRI scores correlate with higher degrees of liver fibrosis.  (*Id.*)  APRI scores of less than 0.7 correlate with lower likelihood of significant liver fibrosis.  (*Id.*)  APRI scores of greater than 2.0 correlate with a high likelihood of significant liver fibrosis or cirrhosis.  (*Id.*)  Dr. Paul's affidavit indicates that Wexford is directed to follow the August 2018 Federal Bureau of Prison (hereinafter "FBOP") Guidelines for the Evaluation and Management of Chronic HCV Infection ("Guidelines"), which categorizes inmates with HCV by three priority levels based upon the APRI and several other factors.  (*Id.*, ¶¶ 6-7).  According to the Guidelines,[4] a patient is in the category of highest priority when their APRI level exceeds 2.0, and is in the lowest level of priority when their APRI is below 0.7.  (*Id.*)

---

[4] Although not made a part of the record by the parties, the undersigned located a publicly available online copy of what it believes to be the correct version of the FBOP's *Clinical Guidance for Evaluation and Management of Chronic Hepatitis C Virus (HCV) Infection*, August 2018, which are attached hereto as "Court's Exhibit A."  *See* Evaluation and Management of Chronic Hepatitis C Virus Infection (bop.gov). Pursuant to Rule 201 of the Federal Rules of Civil Procedure, the undersigned takes judicial notice of these Guidelines.

Since being enrolled in the CCC for his HCV, Plaintiff has had the following medical treatment to monitor his HCV and to determine what additional treatment, if any, he requires for HCV:

- Labs drawn on March 27, 2017. His APRI score was 0.52. WEX000202. (ECF No. 75, Ex. 1 at 19; Aff. of Sandra May, PA, ECF No. 75, Ex. 3).

- Seen by Dr. Lye in the CCC on April 27, 2017 and previous labs reviewed. WEX000219-000220. (ECF No. 75, Ex. 1 at 33-34).

- Labs drawn on August 30, 2017. His APRI score was 2.52. WEX000099. (ECF No. 75, Ex. 1 at 8; Ex. 3).

- Labs were drawn on December 14, 2017, which revealed an APRI score of 3.27. WEX000037. (ECF No. 75, Ex. 1 at 4).

- Labs were drawn on January 11, 2018 to determine his HCV viral load. WEX000104. (ECF No. 75, Ex. 1 at 9).

- Dr. Dina Paul, the Chronic Disease and Case Management Director for Wexford, authored a progress note on January 17, 2018, noting Plaintiff's APRI was 3.3 based on the lab results from December 14, 2017. WEX000066. (ECF No. 75, Ex. 1 at 7). She then ordered a liver and spleen ultrasound due to the Plaintiff's elevated APRI score. WEX000065. (ECF No. 75, Ex. 1 at 6). That same day, however, Plaintiff apparently stabbed himself in the abdomen with a pen and had a CT scan of his abdomen and pelvis. Thereafter, Plaintiff engaged in several other incidents of self-harm. WEX00030-32, and WEX00037. (ECF No. 75, Ex. 1 at 2-4).

- On January 29, 2018, Dr. Paul authored a progress note in which she determined that the CT scan of Plaintiff's liver and spleen were normal and his labs showed elevated LFTs with normal liver function. She further noted that "Patient has current significant mental health disorder including multiple foreign body insertions, most recently on 1-17-18. For this reason, he is not a[n] HCV treatment candidate. He will continue to be followed as per plan and may be a[n] HCV treatment candidate in the future." WEX000063. (ECF No. 75, Ex. 1 at 5).

- On January 30, 2018, Sandra May noted in Plaintiff's medical records that he did not meet the criteria at that time for treatment with Direct Acting Anti-Viral Drugs (hereinafter "DAA drugs") for his HCV. WEX000037. (ECF No. 75, Ex. 1 at 4).

- Seen by Dr. Lye in the CCC on May 17, 2018. WEX000217-218. (ECF No. 75, Ex. 1 at 31-32).

• Labs drawn on July 11, 2018, which revealed an APRI score of 2.549. WEX000032.  (ECF No. 75, Ex. 1 at 3).  These were sent to Dr. Paul for review on August 13, 2018.  (*Id.*)

• Labs drawn on January 1, 2019, which revealed an APRI score of 0.95. WEX000031.  (ECF No. 75, Ex. 1 at 2).

• Seen by Dr. Lye in the CCC on January 22, 2019.  WEX000215-000216. (ECF No. 75, Ex. 1 at 29-30).

• Labs drawn on June 28, 2019, which revealed an APRI score of 0.588. WEX000030.  (ECF No. 75, Ex. 1 at 1).

• Seen by Sandra May in the CCC on July 23, 2019.  WEX000212-000214. (ECF No. 75, Ex. 1 at 26-28).

• Labs drawn on December 13, 2019, which revealed an APRI score of 0.39. WEX000030.  (ECF No. 75, Ex. 1 at 1).

• Seen by Sandra May in CCC on January 27, 2020, at which time it was documented his APRI was 0.39.  WEX000209-000211.  (ECF No. 75, Ex. 1 at 23-25).

• Seen by Sandra May in CCC on July 28, 2020, at which time it was documented his APRI was 0.62.  WEX000205-000207.  (ECF No. 75, Ex. 1 at 20-22).

• Labs drawn January 7, 2021, which revealed an APRI score of 0.58. WEX000175.  (ECF No. 75, Ex. 1 at 10).

• Labs drawn on June 30, 2021.  WEX000183-000185.  (ECF No. 75, Ex. 1 at 11-13).  His APRI score was 0.36. WEX000194 (ECF No. 75, Ex. 1 at 14).

• Seen by Sandra May in the CCC on August 19, 2021.  WEX000194-197. (ECF No. 75, Ex. 1 at 14-17).  The Plaintiff voiced no complaints and had no physical symptoms consistent with advancement of HCV.  (*Id.*)

• Labs drawn on February 10, 2022. His APRI score is 0.49.  WEX000221-000222.  (ECF No. 75, Ex. 1 at 35-36).

(ECF No. 76 at 2-4 and Exs. 1, 2, and 3).

Dr. Paul's affidavit indicates that, at the time it was executed on February 18, 2022,

Plaintiff was at Priority Level 3 because his APRI score was below 0.7, he was not part of

the birth cohort between 1945 and 1965, and he had no comorbidities or co-infections, and no signs of suspected cirrhosis. (ECF No. 75, Ex. 2, ¶ 8). Dr. Paul's affidavit also opined that he "does not exhibit any physical symptoms or clinical exam findings consistent with advanced liver disease[,]" that "based upon [his] diagnostic studies and lab results, the subjective complaints he has, if any, are not caused by HCV[,]" and his "labs are stable and do not indicate any evidence of advanced liver disease. (*Id.*, ¶¶ 9-11). Dr. Paul further opined that "there is no indication that [Plaintiff] suffered a permanent injury or any permanent damage as a result of not being prescribed DAA drugs to date" and she indicated that he "will continued to be evaluated in the CCC every six months and have his labs drawn every six months to determine if his priority level changes. (*Id.*, ¶¶ 12, 13). Finally, Dr. Paul's affidavit indicates that, even if Plaintiff was a high priority for treatment with DAA drugs, he would be referred to the CAMC Infectious Disease Department for further evaluation and prescription of the drugs by one of its doctors, which is regularly done on a case-by-case basis. (*Id.*, ¶¶ 14-15). Defendant May's affidavit also indicates that "[t]hroughout all of the time I have treated [Plaintiff], he has not exhibited any physical signs or symptoms or subjective complaints consistent with advancing Chronic Hepatitis C." (ECF No. 75, Ex. 3, ¶ 7).

Plaintiff has not rebutted Defendants' evidence with any expert opinion or testimony. He has, however, offered his own affidavit in which he asserts that Defendant May acknowledged that he "had met the criteria for DAA treatment and she had recommended to the Collegial Committee that he be treated with DAA drugs" but "[s]he said they rejected her request . . . because of [Plaintiff's] mental health." (ECF Nos. 48, 78 at 6, and 80 at 2). Thus, Plaintiff disputes Defendants' contentions that he "never met the criteria for treatment" and was allegedly "not sick enough" for treatment. (*Id.*)

### III.    STANDARDS OF REVIEW

**A.    Summary judgment standard under Fed. R. Civ. P. 56.**

In evaluating summary judgment motions, Rule 56(a) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a) (2010). Material facts are those necessary to establish the elements of a party's cause of action. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Strothers v. City of Laurel*, 895 F.3d 317, 326 (4th Cir. 2018). Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's claim. *Id.* at 325.

Once the moving party demonstrates such a lack of evidence, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. *Id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986); *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) ("The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial . . . by offering 'sufficient proof in the form of admissible evidence' . . . ."). "A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements." *Brown v. Showboat Atlantic City Propoco, LLC*, No. 08-5145, 2010 WL 5237855, *2 (D.N.J. Dec. 16, 2010) (citing *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Rather, "the non-moving party must

identify specific facts and affirmative evidence that contradict those offered by the moving party." *Id.* (citing *Anderson*, 477 U.S. at 256-57).

A court must not resolve disputed facts or weigh the evidence and may not make determinations of credibility. *Russell v. Microdyne Corp.,* 65 F .3d 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013)); *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir. 1979). However, the party opposing the motion may not rely upon mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Sprenkle v. Hartford Life Ins. Co.,* 84 F. Supp.2d 751 (N.D.W. Va. 2000). Accordingly, summary judgment will generally be granted unless a reasonable jury could render a verdict for the non-moving party on the evidence presented. *Anderson,* 477 U.S. at 247-48. "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration and internal quotation marks omitted).

## B.    Standard for awarding permanent injunctive relief.

A plaintiff seeking a permanent injunction must show that: "(1) [he] has suffered irreparable injury; (2) the available legal remedies are inadequate to compensate for that injury; (3) the balance of hardships between the plaintiff and defendant warrants an equitable remedy; and (4) the public interest would not be disserved by a permanent

injunction." *Herrera v. Finan*, 176 F. Supp. 3d 549, 568 (D.S.C. 2016), *aff'd*, 709 F. App'x 741 (4th Cir. 2017) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court[.]" *eBay Inc.*, 547 U.S. at 391.

"It is well settled that any deprivation of constitutional rights 'for even minimal periods of time' constitutes irreparable injury." *Washington v. Fed. Bureau of Prisons*, No. 5:16-cv-3913-BHH, 2020 WL 553855, at *12 (D.S.C. Feb. 3, 2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  Nonetheless, an injunction will not be issued if there is only a "possibility" of irreparable injury.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  Additionally, when considering the balance of hardships between the litigants and the impact on the public at large prior to issuing an injunction, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24.  "In granting injunctive relief, a court must also pay particular regard for the public consequences of employing the extraordinary remedy of injunction. Where the harms of a particular injunctive remedy outweigh the benefits, a court may decline to adopt it." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 201 (4th Cir. 2005).

## IV.    DISCUSSION

"Hepatitis C is a disease caused by a viral infection of the liver. In certain individuals, hepatitis C can persist as an asymptomatic infection for years.  In others, the virus can lead to liver inflammation, fibrosis (liver scarring), cirrhosis (liver tissue death), and even terminal liver cancer." *Pfaller v. Amonette*, 55 F.4th 436, 442 (4th Cir. 2022). Beginning in 2014, the Food and Drug Administration ("FDA") approved a collection of new drugs for treatment of hepatitis C called "direct-acting antivirals" ("DAA drugs"). *Id.*

As noted by the Fourth Circuit in *Pfaller*, "[n]ot only were [these drugs] less likely to cause serious side effects, but they also boasted cure rates of 90 to 100%." *Id.*; *see also Lovelace v. Clarke*, No. 2:19-cv-75, 2022 WL 4370442, at *3 (E.D. Va. Sept. 21, 2022). The question before this Court is, following the advent of these DAA drugs, "what kind of treatment protocol for administering [DAA drugs] is constitutionally sufficient in a prison system[?]" *Pfaller*, 55 F.4th at 455.

The Wexford Defendants are directed by the WVDOC to utilize the August 2018 FBOP Guidelines as the protocol for evaluation and management of treatment for HCV patients in its custody. "The medical community and the [FBOP] [have] recognized that while immediate treatment of all hepatitis C patients was recommended, prioritization was reasonable where resources were limited." *Pfaller*, 55 F.4th at 455. Nonetheless, some courts have opined that, while prioritization may be permissible and necessary, "there is a difference between 'everyone gets treatment but the worst get it first,'" and a policy that categorically excludes inmates and "effectively says 'only the sickest get treatment, and the rest must get sicker before we treat them.'" *Reid v. Clarke*, No. 7:16-cv-00547, 2018 WL 3626122, at *4 (W.D. Va. July 30, 2018). Plaintiff asserts that Wexford's policy delays or denies necessary treatment and that he must essentially "get sicker" or "never get treatment." *Id.* at *4. Therefore, he contends that Wexford's "wait and see" treatment policy constitutes deliberate indifference to a serious medical need in violation of the Eighth Amendment.

To establish a claim for deliberate indifference to serious medical needs, a prisoner "must satisfy the Supreme Court's two-pronged test set forth in *Farmer v. Brennan* [, 511 U.S. 825 (1994)]." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). *Farmer*'s first, "objective" prong requires a plaintiff to prove that the alleged deprivation was

"sufficiently serious."  511 U.S. at 834 (citation omitted).  The second, "subjective" prong requires a plaintiff to show that prison officials acted with "deliberate indifference." *Scinto*, 841 F.3d at 225.  Thus, "a prisoner must show that he had a serious medical need, and that officials knowingly disregarded that need and the substantial risk it posed." *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018).

The Fourth Circuit has emphasized "that considerations of separation of powers and institutional competence suggest the need for judicial restraint before reaching the stern conclusion that prison administrators' conduct constitutes deliberate indifference." *Lopez v. Robinson*, 914 F.2d 486, 490 (4th Cir. 1990); *see also Buffkin v. Hooks*, No. 1:18-cv-502, 2019 WL 1282785, at \*5 (M.D.N.C. Mar. 20, 2019).  Nonetheless, the Court has also recognized it is inconsistent with the Eighth Amendment for a prison official to withhold treatment from an inmate who suffers from a serious, chronic disease until the inmate's condition significantly deteriorates.  *Gordon v. Schilling*, 937 F.3d 348, 359 (4th Cir. 2019) (citing *Jehovah v. Clarke*, 798 F.3d 169, 181-82 (4th Cir. 2015) (emphasizing that refusal to treat serious medical need can constitute deliberate indifference).

Defendants' motion for summary judgment asserts that Plaintiff cannot meet either prong of *Farmer* and, thus, he cannot demonstrate a right to declaratory or injunctive relief as he has requested.  Therefore, Defendants contend that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law on Plaintiff's claims against them.

### A.    Defendants' motion for summary judgment.

Defendants' motion first asserts that Plaintiff "cannot point to facts on the record which show that he has suffered, or will suffer, an irreparable injury in the absence of a

permanent injunction," as they contend that his HCV is not presently a serious medical need. (ECF No. 76 at 7). Their memorandum of law states:

> While HCV can develop into a serious condition, this is not uniform or necessarily the case, and the Plaintiff has not provided any evidence of any adverse symptoms attributable to HCV in his own case. While, like many diseases, an HCV infection can be a serious medical condition requiring treatment, this is not always the case, and the Plaintiff has not pled any factual allegations which would indicate that he has been injured by this condition.

(*Id.* at 7-8). Defendants rely, in part, on a statement in the CDC's *Hepatis C Surveillance Guidance* indicating that "most people with chronic hepatitis C are asymptomatic" and only "approximately 10%-20% of people living with chronic hepatitis C who have persistent liver inflammation will develop cirrhosis over the course of 20 years, and people with cirrhosis are at risk for developing liver cancer and other serious consequences." (ECF No. 75, Ex. 4). Thus, Defendants seem to suggest that Plaintiff's asymptomatic condition places him at low risk of developing advanced liver disease and indicates no present irreparable injury.

Nonetheless, Defendants acknowledge and do not dispute that Plaintiff's APRI level did increase to the high priority level and, as a result, they claim that, in accordance with the Guidelines and protocol, he was further evaluated for the need for DAA drug treatment. Plaintiff, however, disputes that the protocol was properly followed, claiming that either Lye or May failed to send him to CAMC for the ultrasound and further evaluation by an infectious disease specialist.

When the Plaintiff's APRI level exceeded 2.0 between August and December of 2017, Dr. Paul ordered lab work to determine his HCV viral load, and then, on January 17, 2018, requested a referral for a liver and spleen ultrasound to determine whether treatment with DAA drugs was necessary. WEX000065. (ECF No. 75, Ex. 1 at 6; ECF No.

78 at 7, Ex. 2).  However, the evidence of record demonstrates that, around that same time, Plaintiff suffered a self-inflicted stab wound to his abdomen and underwent a CT scan, with contrast, which indicated that his liver and spleen looked "normal." WEX000063.  (ECF No. 75, Ex. 1 at 5; ECF No. 76 at 3).  Thus, Dr. Paul determined that the ultrasound and any further evaluation at CAMC was not necessary because he showed no signs of liver damage.  Dr. Paul further determined that, due to Plaintiff's "current significant mental health disorder including multiple foreign body insertions," he was "currently not a[n] HCV treatment candidate" but "would continue to be followed as per plan and may be a[n]HCV treatment candidate in the future."  WEX00063.  (ECF No. 75, Ex. 1 at 5).

Moreover, Defendants note, since January 11, 2019, the Plaintiff has not had an APRI level exceeding 0.7, which, along with other factors, places him in the lowest priority category for treatment at this time, but he continues to be regularly evaluated.  (ECF No. 75, Ex. 1, *passim*; Ex. 2, ¶¶ 10-13; ECF No. 76 at 3, 8-9).  Defendants assert that, according to Dr. Paul's expert testimony, the Plaintiff does not exhibit any physical symptoms or clinical exam findings which would suggest advanced liver disease.  (ECF No. 75, Ex. 2 at ¶ 9; ECF No. 76 at 8-9).  Dr. Paul further testified that the Plaintiff's subjective complaints of discomfort are not caused by HCV.  (ECF No. 75, Ex, 2, ¶ 10; ECF No. 76 at 9).  Dr. Paul's sworn expert opinion also extends to her conclusion that, to a reasonable degree of medical certainty, the Plaintiff has not suffered a permanent injury due to not being treated with DAA drugs and does not suffer from any co-infection or other condition which would place him in a higher priority group.  (ECF No. 75, Ex. 2 at ¶ 12; ECF No. 76 at 9).

Defendants further assert that Plaintiff has produced no evidence to raise a factual contradiction to Dr. Paul's expert testimony. (ECF No. 76 at 9). They further contend that he has produced no expert of his own to offer testimony that he has suffered a permanent injury, or will in the future, without DAA drug treatment, and has produced no evidence that his subjective complaints are caused by HCV. (*Id.*) Thus, Defendants argue that the material facts relevant to whether the Plaintiff has suffered or will suffer an irreparable injury which would satisfy the first prong of the standard for permanent injunctive relief are not in dispute, and inure in their favor. (*Id.*)

Defendants further assert that in determining whether an injunction herein would serve equity and the public interest, the nature of the August 2018 FBOP guidelines which Wexford has been directed to utilize should be considered. Defendants contend:

> It is a system of prioritization, not a system of binary eligibility. *See* Exhibit 2 at ¶ 7. The "level 3" patients, with high APRI scores or other co-infections or compounding conditions receive the highest priority for DAA drug treatment, and those of lower priority – those with low APRI scores and without compounding adverse conditions, such as the Plaintiff, who has an asymptomatic infection – must wait until the higher priority patients have been served first. *See Id.* Defendants contend that Plaintiff is asking to be moved from a position of being presently ineligible to be made eligible for treatment, so "he is really asking to jump the line ahead of patients with more serious infections when the FBOP prioritization system is taken into account."

(*Id.* at 10). They further assert that it would be "profoundly inequitable" to place an asymptomatic inmate ahead of those who are symptomatic and would not serve the public interest. (*Id.*) Therefore, they contend that Plaintiff cannot satisfy the criteria for a permanent injunction and that they are entitled to summary judgment on his claims for injunctive relief.

Defendants also assert that Plaintiff is not entitled to declaratory relief because he cannot demonstrate that their conduct violates the Eighth Amendment. They deny that

Wexford has an alleged practice of withholding DAA drug treatment from inmates "until manifesting in liver fibrosis, liver scarring, cirrhosis of the liver, or liver cancer," rather than providing DAA drug treatment to any HCV-infected inmate as a matter of course. (ECF No. 76 at 10). Rather, they assert that the FBOP Guidelines, which they follow, simply help prioritize who should receive treatment first. They assert that this does not demonstrate deliberate indifference and does not violate the Eighth Amendment. (*Id.*)

Defendants contend that there is no dispute of material facts concerning Plaintiff's condition or their approach to his treatment. They assert that "[t]here are not sufficient facts on the record to create a triable issue as to whether the Plaintiff suffered from a 'sufficiently serious' deprivation of medical care" and "no evidence on the record that [Plaintiff] has experienced, or will in the future experience, any of the possible serious side effects of HCV." (*Id.* at 13-14). Thus, they contend that "[t]here is simply no evidence that Plaintiff is suffering from a serious medical need to satisfy the burden of an Eighth Amendment claim." (*Id.* at 14).

Defendants further contend that Plaintiff has offered no evidence to demonstrate a genuine issue of material fact concerning the subjective prong of the deliberate indifference standard. Their memorandum states:

> The case record also shows the subjective prong to be unsatisfied. The Plaintiff is enrolled in the CCC. *See Id.* at ¶ 2. In that program, the Plaintiff has received biannual lab work to monitor his liver functions. *See Id.* at ¶¶ 3-4. When his APRI levels showed a concerning level, further tests – including a liver and spleen CT – were done to determine whether he was developing serious symptoms, and was found not to be. WEX000065

(*Id.* at 14). Defendants further assert that Dr. Paul's unrebutted affidavit demonstrates that Wexford and its employees have acted within the FBOP Guidelines with respect to Plaintiff's treatment:

> Wexford does actively refer inmates in West Virginia to Charleston Area Medical Center Infectious Disease Department for evaluation for treatment of HCV with DAA drugs, despite Mr. Adamson's contention otherwise. Wexford makes these determinations on a case by case basis involving the clinical evaluation of the individual patient, the patient's diagnostic studies, the patient's lab results, and the 2018 Federal Bureau of Prisons criteria for prioritization of treatment. There is no blanket policy as alleged by Mr. Adamson in which an inmate is denied DAA drugs until they have liver fibrosis, liver scarring, cirrhosis of the liver, or liver cancer.

ECF No. 75, Ex. 2, ¶ 15; ECF No. 76 at 14). Defendants argue that their compliance with the Guidelines in prioritizing inmate treatment by severity of symptoms demonstrates, not deliberate indifference, but "attentive monitoring, a humane system of prioritization, and no ill effects suffered by the Plaintiff which can be attributed to his condition." (ECF No. 76 at 14). Therefore, they assert that there are no genuine issues of material fact on Plaintiff's Eighth Amendment claims and that they are entitled to judgment as a matter of law on his claims for a declaratory judgment. (*Id*. at 14-15).

### B.    Plaintiff's response.

Plaintiff's response asserts that, despite lab results demonstrating that he did meet the threshold levels warranting DAA drug treatment, Defendants refused to treat him. (ECF No. 78 at 2). Plaintiff claims that Defendants' decision to "sit and surveil the disease's progress" rather than "develop a curative treatment plan" is "evidence of Defendants' deliberate indifference to him." (*Id*.) Plaintiff further takes issue with Dr. Paul's affidavit. Specifically, Plaintiff asserts that it is Wexford's policy to send inmates with HCV to CAMC for evaluation and that Dr. Paul ordered him to be evaluated there. He further asserts that Defendants Lye and May failed to send him to CAMC for further diagnostic evaluation, just days after he had troubling lab results showing elevated liver levels. (ECF No. 78 at 2-3). Plaintiff further contends that Dr. Paul's affidavit basically acknowledges that there is no reason for treatment until "damage is done." (*Id*. at 3).

Plaintiff's response (and his sur-reply) also take issue with Defendant May's affidavit, claiming that she has only chosen three lab results out of 12 to address and failed to acknowledge that she told him that his test results met the criteria for treatment, but was denied the same due to his mental health issues. (*Id.* at 3-4). Plaintiff's sur-reply also contends that this decision was made without consulting anyone from the contracted mental health care provider at the prison. (ECF No. 80 at 2).

### C.    Defendants' reply.

Defendants' reply contends that Plaintiff has asserted nothing more than a disagreement over his course of treatment and their medical judgment. (ECF No. 79 at 3). They further assert that "he is not being denied these drugs. He is simply not eligible for them based on his priority level at this time." (*Id.*) They further argue that "[i]f and when Plaintiff reaches the priority level, he will be referred to CAMC for evaluation to be prescribed DAA drugs." (*Id.*)

To the extent that Plaintiff further asserts that Defendants acted with deliberate indifference when they failed to refer him to CAMC for a liver ultrasound when his lab results previously met the priority criteria, Defendants contend:

> Dr. Paul explains in her January 29, 2018, progress note that on the same day that she requested the ultrasound, Plaintiff had an abdominal and pelvic CT scan due to him being stabbed in the right lower quadrant. (ECF No. 75, Ex. 1, p. 5). The CT scan found his liver and spleen to be normal. (*Id.*). Therefore, Dr. Paul found that the ultrasound was not necessary. (*Id.*). Although Plaintiff argues that his labs in January 2018 had a APRI score that was high enough to warrant DAA drugs, the high APRI score is why Dr. Paul ordered the liver and spleen ultrasound, which ultimately revealed a normal liver and spleen. (ECF No. 75, Ex. 1, p. 6). As explained by Dr. Paul in her affidavit, an APRI score is found to correlate with the degree of liver fibrosis, which Plaintiff did not have based on the CT scan. Ex. 1, ¶ 5. In fact, Plaintiff's labs improved and his most recent APRI score was 0.49. Affidavit of S. May, ¶ 6, Ex. 2. This supports Dr. Paul's opinions that Plaintiff does not have any advanced liver disease currently. Ex. 1, ¶¶ 9-12.

(ECF No. 79 at 4). Again, Defendants assert that "[a]ll of Plaintiff's medical treatment pertaining to his HCV has involved medical judgment on the part of Dr. Lye, Sandra May, and Dr. Paul. This is insufficient to establish the subjective intent necessary to prevail on a deliberate indifference claim. *See Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975) (Summary judgment for defendants affirmed where claim that inmate received constitutionally inadequate medical treatment involved a question of medical judgment not subject to judicial review.). (*Id.*)

In sum, Defendants assert that Plaintiff has failed to produce sufficient evidence to rebut their contentions that his asymptomatic HCV status does not presently constitute a serious medical need and that Defendants, using their medical judgment and acting in accordance with the Guidelines for prioritization of treatment, were not deliberately indifferent to his serious medical needs. (*Id.*) Defendants further assert that they have not acted in a manner that is "grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness," and are, therefore, entitled to summary judgment on Plaintiff's declaratory judgment claim. *Miltier v. Beorn*, 896 F.2d 848, 851-852 (4th Cir. 1990). (*Id.* at 4-5).

### D. Plaintiff's sur-reply.

Plaintiff's sur-reply disputes Defendants' lack of irreparable injury argument. He says it is Wexford's policy to "sit back and watch as long as there is no irreparable injury" but that he continues to endure pain and suffering and mental anxiety, and their policy allows the disease to progress in his body before treatment is even considered. (ECF No. 80 at 1-2). He further speculates that, if and when he might be approved for treatment, it will not undue the damage already done to his body. (*Id.*) Plaintiff also disputes that he has not presently suffered any physical injury. He contends that he has a "spider web

of blood vessels" that covers his upper body, which he attributes to HCV progression (*Id.* at 3). However, he offers no expert evidence or opinion to support this. Likewise, while Plaintiff acknowledges that his liver test levels will fluctuate, he says that the damage done when the levels are elevated will be long-term or permanent. (*Id.*) Again, however, he offers no expert or other evidentiary support for this contention.[5]

Finally, Plaintiff's sur-reply relies upon admissions allegedly made by Lye and May acknowledging that they are not "qualified" to treat HCV or to "develop a treatment plan," and that all HCV patients are ultimately referred to an infectious disease specialist for DAA drug treatment evaluation and management. (*Id.* at 3-4). He says, "from day one, Defendants knew they were not qualified to treat Plaintiff" yet they have had him registered in the CCC for at least five years. (*Id.*) Thus, he suggests that Defendants' failure to refer him to an infectious disease specialist constitutes deliberate indifference. (*Id.*)

Even taking all the evidence of record in the light most favorable to Plaintiff, there is an absence of evidence to demonstrate that Defendants have been deliberately indifferent to a serious medical need. When Plaintiff's liver test results rose to concerning levels, Dr. Paul determined that additional evaluation was necessary and ordered a liver and spleen ultrasound. However, when Plaintiff had the CT scan of his abdomen, the Wexford medical providers were able to ascertain from that scan that Plaintiff did not appear to have any active liver damage. Consequently, in Defendants' judgment, there was no need for further diagnostic evaluation or DAA drug treatment at that time. To the

---

[5] Plaintiff previously filed a motion for appointment of an expert witness under Rule 706 of the Federal Rules of Evidence. (ECF No. 74). However, the undersigned denied that motion because the court cannot appoint an expert witness for an indigent plaintiff to further partisan interests and the undersigned did not believe the appointment of a neutral expert to aid the court in the assessment of technical issues was then appropriate. (ECF No. 77). Plaintiff did not object to this ruling under Rule 72(a) of the Federal Rules of Civil Procedure.

extent that Plaintiff's mental health issues may have further deemed him to not be a good candidate for DAA drug treatment at that time, that also factored into the medical judgment of Defendants.

Plaintiff has offered no evidence to rebut those findings. He has simply not demonstrated anything other than his own disagreement with the Defendants' medical judgment, which does not rise to the level of an Eighth Amendment violation. He has not shown any significant injury at the hands of Wexford's treatment Guidelines or that the Defendants have acted with deliberate indifference in making medical decisions in accordance with those Guidelines. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact, and that Defendants are entitled to judgment as a matter of law on Plaintiff's claims seeking a declaratory judgment that the Wexford Defendants' policy and conduct violated the Eighth Amendment.

Moreover, Plaintiff has not demonstrated that he has suffered or will suffer an irreparable injury without the injunctive relief he seeks. Nor has Plaintiff sufficiently established that an injunction requiring his immediate treatment or consideration therefor will serve equitable and public interests. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact, and that Defendants are also entitled to judgment as a matter of law on Plaintiff's claims for permanent injunctive relief.

## V.    RECOMMENDATION

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** Defendants' Motion for Summary Judgment (ECF No. 75) and dismiss this matter from the docket of the court.

23

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., Senior United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(C), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing), from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of this Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may only be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).  Copies of such objections shall be served on Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy of the same to Plaintiff, and to transmit a copy to counsel of record.

February 15, 2023

Dwane L. Tinsley
United States Magistrate Judge

24